# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Civil Action:

| | | |
|---|---|---|
| **PATRICIA TODD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **COMPLAINT** |
| **v.** | ) | |
| | ) | |
| **PAYMENTUS GROUP, INC.,** | ) | |
| **PAYMENTUS HOLDINGS, INC.,** | ) | |
| | ) | |
| **Defendants.** | | |

_____

The Plaintiff, Patricia Todd, complaining of Defendants, alleges the following:

### JURISDICTION AND VENUE

1.      Plaintiff has instituted this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII), the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.*, the Equal Pay Act, 29 U.S.C. § 206, *et seq.* (EPA), and the public policy of North Carolina to recover damages for the violation of her civil rights.  Jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 2000e–5(f), 29 U.S.C. § 626(c), 29 U.S.C. §216(b), and 28 U.S.C. § 1331.

2.      Plaintiff resides in, the acts described herein occurred within, and Defendants transact business in the Western District of North Carolina.  Venue is therefore proper in this Court pursuant to 28 U.S.C. § 1391.

1

**PARTIES**

3.     The Plaintiff, Patricia Todd, is a resident of Mecklenburg County, North Carolina. At all times pertinent to this action, Plaintiff was an "employee" of Defendants within the meaning and definition of 42 U.S.C. § 2000e(f), 29 U.S.C. § 630(f), 29 U.S.C. § 203(e)(1), and North Carolina law.

4.     The Defendant Paymentus Group, Inc. is a corporation established pursuant to the laws of the State of Delaware, which conducts business throughout North Carolina and the United States.  Defendant Paymentus Group, Inc. provides electronic billing and payment services to its clients.  Defendant Paymentus Group, Inc. is a wholly owned subsidiary of Defendant Paymentus Holdings, Inc.

5.     The Defendant Paymentus Holdings, Inc. is a corporation established pursuant to the laws of the State of Delaware, which conducts business throughout North Carolina and the United States.  Defendant Paymentus Holdings, Inc., among other pursuits, provides electronic billing and payment services to its clients, and fully owns and operates Defendant Paymentus Group, Inc.

6.     Defendants Paymentus Group, Inc. and Paymentus Holdings, Inc. acted as joint employers of Plaintiff.   At all times pertinent to this action, Defendants collectively employed over 500 employees, and were the "employer" of Plaintiff within the meaning and definition of 42 U.S.C. § 2000e(b), 29 U.S.C. § 630(b), 29 U.S.C. § 203(d), and the

2

common law of North Carolina. Unless otherwise specified, Defendants shall be collectively referred to hereafter as "Defendant" or "Paymentus."

## FACTS

7. Plaintiff is a female. She was born in June, 1955, and is presently 68 years of age. At the time of her termination, she was 67 years of age.

8. Plaintiff was employed by Defendant from January 6, 2020 until May 5, 2023, as Senior Counsel, specializing in FINTECH transactions. When hired by Defendant, Plaintiff had more than 35 years of experience overseeing legal transactions, and had specialized in hi-tech matters since 1995.

9. As Senior Counsel, Plaintiff oversaw all phases of FINTECH transactions for Defendant, while creating and implementing highly effective and efficient processes for Defendant's small and understaffed legal department. Indeed, Plaintiff was instrumental in helping lead Defendant's legal department through the COVID-19 pandemic, and her wealth of knowledge and experience proved invaluable to the growing company.

10. At all times during Plaintiff's employment, she met or exceeded all reasonable expectations of her employer in the performance of her duties, and routinely received excellent evaluations and commendations for her work. Prior to September, 2022, and the events described below, Plaintiff was never the subject of any disciplinary action, and was never made aware of any significant performance problems.

11. Nevertheless, despite her excellent performance, Plaintiff remained significantly underpaid throughout her tenure, given her responsibilities, her experience, and the market.

Plaintiff addressed the issue each year in January during her annual review, but Defendant refused to meaningfully address the disparity. Plaintiff came to understand, prior to her termination, that her age and gender were significant factors in her artificially depressed compensation.

12. Plaintiff began to better understand Defendant's discriminatory practices in September, 2022, when Defendant hired a new attorney for the legal team ("New Hire"). Specifically, Defendant hired a male who was more than 25 years younger than Plaintiff and had significantly less experience, yet was granted a reporting structure, compensation, and benefits far exceeding that of Plaintiff.

13. The New Hire initially began assisting Plaintiff with some of the more complex transactions she managed, as she helped train him in his responsibilities, but it soon became clear that he had been hired to be her replacement, and the preferential treatment showed towards him by management continued until her termination.

14. Shortly before Defendant hired the younger male, Defendant's General Counsel (GC) discussed the matter with Plaintiff, as she knew the younger male and had advocated for the hire. During the course of that conversation, the GC remarked to plaintiff that he "couldn't believe" that the New Hire had accepted compensation as low as plaintiff was making, but that he had given the New Hire a desirable title and "loaded him up with stock options," both considerations that had been denied to Plaintiff.

15.    The GC, who directed many of the actions against Plaintiff, as described below, was a key member of Defendant's executive leadership team and also held the title of Senior Vice President.

16.    Plaintiff was disturbed by the transparency of the inequity, and approached the GC two weeks later, on or about September 13, 2022, to address the matter.   In that conversation, Plaintiff communicated her concern that she had remained underpaid throughout her tenure, that he, her supervisor, and the prior GC had all acknowledged that fact, and that promises had been made to remedy the issue that had never materialized.

17.    Additionally, she voiced her concern that the offer and ascension of the New Hire in the reporting structure, and his corresponding compensation, evidenced clear and intentional discrimination based on age and gender.

18.    Immediately, the GC became irate, rejected Plaintiff's requests to consider any adjustment to her compensation or the legal team structure, and flatly ended the conversation.

19.    Plaintiff was taken aback by the reaction, but understood that Defendant's management was refusing to address the issue.  She was stunned however when, just *nine days later*, the GC directed her to a virtual meeting with him and the head of Defendant's human resources department (HR), and abruptly issued a formal written warning to her, placed her on probation, and effectively forecasted her termination.

20.     Although the reprimand was the first of any kind issued to her by Defendant, it was labeled a "Final Written Warning," and she was told that she could be terminated if she discussed the matter with anyone else in the company.

21.     The reprimand was baseless, and purported to address manufactured and mischaracterized incidents, some of which allegedly had occurred months and/or years before.   In fact, the reprimand was clear and transparent retaliation for Plaintiff's communication of significant discriminatory practices, based on Plaintiff's age and gender, that were enacted and condoned by Defendant's management team.

22.     Plaintiff, who in a 35-year career had never received a reprimand for anything, immediately drafted a response to the allegations, which were untrue, subjective, and wholly unrelated to her work and performance.   She delivered her written response that day, in which she refuted the substance, noted that there had been no investigation (nor any input from her) as to the allegations prior to the issuance of the Final Written Warning, and reiterated her concerns that she was being discriminated against and targeted because of her age and gender, through both disparate treatment and artificially depressed compensation.

23.     Plaintiff closed her correspondence with the conclusion that "I am firmly convinced that my salary has remained low simply due to my age, and the fact that management is aware that I have few opportunities outside of Paymentus due to the fact that I am closing in on retirement age."

24.     The retaliation against Plaintiff for the September 9 meeting, which began with the Final Written Warning, continued unabated until she was ultimately terminated on May 5, 2023.

25.     As noted by Plaintiff in the meeting, Defendant has a pattern and practice of paying females less than males for similar work, and for treating its younger employees more favorably than its older ones.

26.     In fact, shortly before Plaintiff's termination, one of Defendant's female managers approached Plaintiff and confirmed that, in a review of Defendant's payroll records, she had noted that female employees were paid less than males for similar work across the company.

27.     Additionally, Defendant's management routinely gave more prominent roles and assignments to its male employees.

28.     On more than one occasion, Defendant's management team derisively joked about "the ladies in legal," while referring to Plaintiff and a much junior colleague, who both reported to Defendant's Chief Compliance Officer (CCO), and not the GC.  That treatment of Plaintiff—by any metric, one of the most experienced attorneys employed by Defendant—stood in stark contrast to the preferential treatment afforded to the New Hire.

29.     The disparate treatment of Plaintiff extended to her job responsibilities, as well.  As the New Hire acclimated to the position, Defendant began shifting Plaintiff's higher-end and client-facing duties to him, and delegating lower-level work to Plaintiff and her junior female colleague.  Additionally, the transparent retaliation continued.

30.    Additionally, by way of example, Plaintiff was subjected to the following retaliatory acts:

a.  She was passed over for a sales incentive trip she earned in favor of the New Hire;

b.  The GC and CCO each refused to speak with her for any reason outside the presence of the other;

c.  Other team members were instructed not to speak to her alone on the phone;

d.  She was directed to cease direct contact with clients that were accustomed to calling her directly, and obtain assignments from a "legal mailbox" customarily used by a paralegal team;

e.  She was the only attorney directed to submit subjective written goals, which was outside of company policy and practices;

f.  She was forced to attend "counseling" sessions as a result of one of the unfounded accusations in the reprimand.

31.    The retaliation and ostracism continued through the first four months of 2023, though Plaintiff continued to abide by the requirements in the reprimand, produce outstanding work, and engage in good faith in the counseling sessions ordered by Defendant's management team.

32.    In fact, in January, 2023, Plaintiff earned another excellent performance evaluation, delivered by the CCO, in which she received commendations for her work and a marginal increase in pay (though her compensation package remained significantly below that of the

8

New Hire).  In the meeting with the CCO, she questioned the Final Written Warning and the CCO confirmed that it was largely baseless.

33.     During that discussion, Plaintiff remarked that she was open to a meeting with a junior colleague to alleviate any concerns referred to in the reprimand, and the CCO agreed to facilitate the discussion.  In response, the GC sent a memorandum alleging a conflict between the two, and ordered Plaintiff to mandatory counseling, purportedly to help them "get along" better.

34.     Plaintiff immediately perceived that the counseling sessions were not for Defendant's stated purposes, however; rather than an effort to help her "get along" with a colleague, she understood that the third-party counselor retained by the company was engaged as a pretext to filter communications between Plaintiff and management, and set up her termination.

35.     Specifically, during the six hour-long sessions, the counselor routinely sought information about her satisfaction with her job, pay, and her relationships with her coworkers, and made other transparent attempts to gather information from Plaintiff. Likewise, Defendant's management utilized the counselor to inform Plaintiff that she was being stripped of many of her former management and senior-level responsibilities, including distributing work to junior transaction attorneys, maintaining the Contract Play Book and legal form and clause banks she had developed, supervising or training new attorneys, or heading up contract training for Defendant's sales team.

9

36.     The counselor also informed Plaintiff that, moving forward, she would be considered a peer with the second-year junior female attorney, with the obvious implication being that she would be below the New Hire on the organizational chart.

37.     The result, which was clearly a demotion, was to place Plaintiff on the same level as the junior, entry-level Paymentus attorney, as much of the complex work she had been performing was redistributed to the newly hired younger male attorney, despite her consistently excellent work product.

38.     The counseling continued an effort, spearheaded by the GC, to push Plaintiff from the company, one way or another.  In fact, in a meeting shortly before her termination, the GC confirmed his intentions, asking Plaintiff, "if you don't like how things are going with your job, why don't you just quit?"  The question surprised Plaintiff, as she had given no indication to the GC nor anyone else that she was unhappy in her position.

39.     In response, Plaintiff said that she enjoyed her work and reiterated that, at her age, the prospects of obtaining comparable employment were bleak.

40.     A few days later, on May 5, 2023, the GC scheduled a meeting with Plaintiff and a representative from HR, ostensibly to "go over the results of the counseling sessions."  In that Friday afternoon meeting, he fired her, alleging only that she had not "participated in good faith" in the counseling sessions, which was unsupportable and untrue.

41.     Shortly thereafter, the GC sent Plaintiff a written notice of termination restating several of the baseless allegations in the Final Written Warning, despite the fact that he had

entirely ignored her detailed written response sent months earlier, which directly refuted the allegations.

42.     The termination, and its purported rationale, were also contradictory to her January, 2023 performance evaluation, as noted above, in which her performance was lauded and the CCO had acknowledged that most of the allegations in the reprimand were untrue.

43.     As noted above, the termination of Plaintiff – a longtime high-performing employee with no history of performance problems or disciplinary issues prior to her protected activity – was clearly pretextual retaliation for objecting to discriminatory practices and raising those issues with Defendant's management team.

44.     Following her termination, Defendant effectively seized Plaintiff's personal email, which had been erroneously linked with her work email by Defendant's email service provider.  Despite numerous attempts and requests to obtain assistance to resolve the issue, Defendant has continuously refused Plaintiff access to her longtime personal email address.

45.     As a result of Defendant's actions, and Plaintiff's inability to attain comparable employment, Plaintiff has suffered extraordinary damages; financially, emotionally, and professionally.

## ADMINISTRATIVE REMEDIES

46.     On July 28, 2023, Plaintiff filed EEOC Charge # 430-2023-01853, with the Equal Employment Opportunity Commission (EEOC) in Charlotte, North Carolina.  Plaintiff's charge alleged gender and age discrimination and retaliation.

47.    On October 23, 2023, Plaintiff filed a Supplemental/Amended Charge with the EEOC in Charlotte, North Carolina, adding Defendant Paymentus Holdings, Inc. and revising the Charge form.  Her substantive allegations went unaltered.

48.    On April 4, 2024, EEOC issued notice of Plaintiff's right to sue with respect to her charge against the Defendants.  Plaintiff has complied with all procedural prerequisites prior to filing this claim.

### FIRST CLAIM FOR RELIEF
### Gender Discrimination in Violation of Title VII of the
### Civil Rights Act of 1964, *as amended*

49.    Plaintiff incorporates the foregoing paragraphs as if fully set out herein.

50.    At all times pertinent to this action, Plaintiff was within a protected class as a female, she was subject to the protections of Title VII, she alerted management to violations of Title VII, and her performance exceeded any reasonable expectations of her employer and was superior to that of male employees, and those who had not complained of and opposed discrimination in the workplace.

51.    Defendant wrongfully and intentionally discriminated against Plaintiff because of her gender, in violation of Title VII, as follows:

   a.  By paying Plaintiff less than her male counterparts, including base salary, bonus, and stock options;

   b.  By denying Plaintiff a job title commensurate with her responsibilities;

   c.  By altering its customary reporting structure based on gender;

d. By designating less desirable assignments and responsibilities to the female lawyers on the legal team;

e. By reprimanding Plaintiff following her report of the above discriminatory practices;

f. By shifting her responsibilities to a younger, male colleague;

g. By forcing her to attend counseling;

h. By terminating Plaintiff's employment;

i. By manufacturing false and baseless reasons for her termination.

52. Defendant's reasons for its termination of Plaintiff are pretextual, and unworthy of belief.

53. As a proximate result of Defendant's illegal acts of gender discrimination against Plaintiff, Plaintiff has suffered substantial damages, including lost income and benefits and other economic losses; mental anguish and emotional distress; loss of reputation and quality of life; and other damages to be proven at trial.

54. Plaintiff is entitled to appropriate relief pursuant to Title VII, including compensatory damages and reasonable attorneys' fees and costs for her representation herein pursuant to 42 U.S.C. § 2000e-5(k).

### SECOND CLAIM FOR RELIEF
### Retaliation in Violation of Title VII of the
### Civil Rights Act of 1964, *as amended*

55. Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

56.     As alleged above, Plaintiff objected to clearly discriminatory practices enacted and condoned by Defendant's management team.  Plaintiff reported those practices verbally in conference, and through her rebuttal memorandum to Defendant's reprimand following her initial report.

57.     Following Plaintiff's objections to those practices, she was retaliated against, for the above protected activity in violation of Title VII, 42 U.S.C. § 2000e-3, as follows:

a.   By reprimanding Plaintiff following her report of the above discriminatory practices and issuing a Final Written Warning;

b.   By shifting her responsibilities to a younger, male colleague;

c.   By ostracizing her in her position;

d.   By forcing her to attend counseling;

e.   By requiring her to submit annual goals outside of company practices;

f.   By demoting her and stripping her supervisory responsibilities;

g.   By directing her to cease direct contact with clients;

h.   By delegating the sales incentive trip she had earned to the New Hire;

i.   By terminating Plaintiff's employment;

j.   By manufacturing false and baseless reasons for her termination;

k.   By refusing to facilitate access to her personal email account.

58.     Defendant's purported reasons for termination of Plaintiff are pretextual, and unworthy of belief.

59.     As a proximate result of Plaintiff's opposition to discriminatory practices, and

Defendant's subsequent retaliatory acts against Plaintiff, Plaintiff has suffered substantial damages, including loss of income and benefits and other economic losses, mental anguish and emotional distress, loss of reputation and quality of life, and other damages to be proven at trial.

60.    Plaintiff is entitled to appropriate relief pursuant to Title VII, including compensatory damages and reasonable attorney's fees and costs for her representation herein, as set forth above.

## THIRD CLAIM FOR RELIEF
### Age Discrimination in Violation of the ADEA

61.    Plaintiff incorporates the foregoing paragraphs as if fully set out herein.

62.    At all times pertinent to this action, Plaintiff was within the protected age category, and subject to the protection of the ADEA; her performance was superior to that of substantially younger employees who were retained, and exceeded any reasonable expectations of Defendant; and subsequent to her discharge, a substantially younger employee who was less experienced and qualified for the job, assumed her duties while performing at a lower level than Plaintiff.

63.    Defendant wrongfully and intentionally discriminated against Plaintiff because of her age, in violation of the ADEA, 29 U.S.C. § 621 *et seq*., as follows:

      a.  By paying Plaintiff less than her younger counterparts, including base salary, bonus, and stock options;

      b.  By denying Plaintiff a job title commensurate with her responsibilities;

15

c.  By altering its customary reporting structure based on age;

d.  By directing Plaintiff to help train her replacement;

e.  By reprimanding Plaintiff following her report of the above discriminatory practices;

f.  By shifting her responsibilities to a younger, male colleague;

g.  By forcing her to attend counseling;

h.  By selecting a replacement that was substantially younger, less qualified, and less experienced;

i.  By terminating Plaintiff's employment;

j.  By manufacturing false and baseless reasons for her termination.

64.    Defendant's reasons for its termination of Plaintiff are pretextual, and unworthy of belief.

65.    As a proximate result of Defendant's acts of age discrimination against Plaintiff, Plaintiff has suffered substantial damages, including loss of income and benefits and other economic losses, and is entitled to appropriate relief pursuant to the ADEA, including compensatory and liquidated damages, and reasonable attorneys' fees and costs for her representation pursuant to 29 U.S.C. § 626.

**FOURTH CLAIM FOR RELIEF**
**Retaliation in Violation of the ADEA**

66.    Plaintiff incorporates the foregoing paragraphs as if fully set out herein.

67.     As alleged above, Plaintiff objected to clearly discriminatory practices enacted and condoned by Defendant's management team.  Plaintiff reported those practices verbally in conference, and through her rebuttal memorandum to Defendant's reprimand following her initial report.

68.     Defendant wrongfully and intentionally retaliated against Plaintiff because of her age, in violation of the ADEA, 29 U.S.C. § 621 *et seq*., as follows:

    a.  By reprimanding Plaintiff following her report of the above discriminatory practices and issuing a Final Written Warning;

    b.  By shifting her responsibilities to a younger, male colleague;

    c.  By ostracizing her in her position;

    d.  By forcing her to attend counseling;

    e.  By requiring her to submit annual goals outside of company practices;

    f.  By demoting her and stripping her supervisory responsibilities;

    g.  By directing her to cease direct contact with clients;

    h.  By delegating the sales incentive trip she had earned to the New Hire;

    i.  By terminating Plaintiff's employment;

    j.  By manufacturing false and baseless reasons for her termination;

    k.  By refusing to facilitate access to her personal email account.

69.     Defendant's reasons for its termination of Plaintiff are pretextual, and unworthy of belief.

70.     As a proximate result of Defendant's acts of retaliation against Plaintiff, Plaintiff has suffered substantial damages, including loss of income and benefits and other economic losses, and is entitled to appropriate relief pursuant to the ADEA, including compensatory and liquidated damages, and reasonable attorneys' fees and costs for her representation pursuant to 29 U.S.C. § 626.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Equal Pay Act (The Fair Labor Standards Act of 1938, as amended by the Equal Pay Act, 29 U.S.C. § 206 *et. seq.*)**

71.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

72.     Defendants have discriminated against Plaintiff in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206 *et. seq.* as amended by the Equal Pay Act of 1963 ("EPA").

73.     The EPA requires that men and women receive equal pay for equal work performed.

74.     Defendant has paid Plaintiff less than similarly situated male employees who performed equal work on jobs, the performance of which required equal skill, effort and responsibility and which were performed under similar working conditions, as follows:

   a.  By paying Plaintiff less than her male counterparts;

   b.  By engaging in and condoning a pattern and practice of paying females less than males for substantially similar work;

   c.  By paying less than equitable pay for Plaintiff's position;

18

  d. By refusing to adjust her compensation following her well-founded complaints regarding Defendant's unlawful pay practices; and,

  e. By ultimately terminating her employment following her complaints of unequal pay.

75. The difference in pay between Plaintiff and similarly situated male employees was and is not due to any bona fide seniority, merit or incentive system or any factor other than sex, but was because of gender.

76. Defendants did not act in good faith and created and perpetuated gender-based wage discrimination in violation of the EPA by offering Plaintiff and paying Plaintiff less than her male predecessor and other similarly situated male employees.

77. The above conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a). The three-year statute of limitations applies to Defendants' EPA violations because their violations were and are willful.

78. As the proximate result of defendant's violations of the EPA, plaintiff suffered significant economic damages and is entitled to backpay, attorneys' fees, and liquidated damages pursuant to 29 U.S.C. § 216(b).

**SIXTH CLAIM FOR RELIEF**
**Wrongful Discharge in Violation of the Public Policy of North Carolina**

79. Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

80. The public policy of North Carolina, as expressed in N.C. Gen. Stat. § 143-422.2, mandates that employers of fifteen or more employees shall not discriminate or retaliate

on the basis of gender or age, or engage in discriminatory practices in the workplace. At all times pertinent to this claim, Defendant employed in excess of fifteen employees.

81.     As stated above, Plaintiff was female over the age of 40 who was protected by the public policy of North Carolina and, who was, at the time of her termination, consistently performing at a level higher than other employees who were similarly situated.

82.     Plaintiff, after clear and transparent discriminatory treatment by Defendant, objected to the practices, and was reprimanded specifically for those objections.

83.     Following that reprimand, she was retaliated against, ostracized in her position, effectively demoted, and ultimately terminated.

84.     Defendants' reasons for its termination of Plaintiff are pretextual, and unworthy of belief.

85.     Defendants wrongfully and intentionally discriminated and retaliated against Plaintiff because of her objection to discriminatory practices, in violation of the public policy of North Carolina, as described in detail above.

86.     Plaintiff will suffer irreparable harm in the absence of equitable relief from this Court, and there is no adequate remedy at law to prevent such harm. Accordingly, Plaintiff is entitled to declaratory, injunctive and equitable relief including reinstatement of Plaintiff to her position with Defendants.

87.     As a proximate result of Defendants' violations of the public policy of North Carolina, Plaintiff has incurred and suffered substantial damages, including lost income and benefits and other economic losses; mental anguish and emotional distress; loss of

Case 3:24-cv-00498-MOC-SCR   Document 1   Filed 05/22/24   Page 20 of 22

quality and enjoyment of life, and employment reputation; and other losses to be proven at trial.

88.     The acts of Defendant, as described above, were deceptive, willful and wanton, and evinced an intentional or reckless indifference to and disregard for the civil rights of Plaintiff.  Aggravating circumstances concerning Defendants' conduct are provided in ¶¶ 7-45 above.  Accordingly, Plaintiff is entitled to punitive damages in an amount to be determined by the jury.

## PRAYER FOR RELIEF

The Plaintiff requests the following relief:

(1)     That Plaintiff be reinstated to her position with Defendant, with back pay and all benefits and seniority rights;

(2)     That Plaintiff recover of the Defendant compensatory damages in an amount in excess of $100,000;

(3)     That Plaintiff recover liquidated damages pursuant to 29 U.S.C. § 626 and 29 U.S.C. § 216(b);

(4)     That Plaintiff recover punitive damages in an amount to be determined by the jury;

(5)     That Plaintiff recover the costs of this action, including reasonable attorneys' fees for her representation herein as required in 42 U.S.C. 2000e, *et. seq*, 29 U.S.C. § 626, and 29 U.S.C. § 216(b);

(6)      That Plaintiff recover pre-judgment and post-judgment interest on all damages awarded herein; and

(7)      That this Court grant such other relief as it deems just and appropriate.

**Request for Jury Trial**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues presented herein.

This the 22nd day of May, 2024.

/s/ R. Michael Elliot
R. Michael Elliot (42806)
Attorney for Plaintiff
Elliot Morgan Parsonage, PLLC
300 E. Kingston Ave, Suite 200
Charlotte, NC 28203
Telephone: (704) 707-3705
Email: michaelelliot@emplawfirm.com

22