## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:24-cv-498-MOC-SCR

| | | |
|---|---|---|
| **PATRICIA TODD,** | **)** | |
| | **)** | |
| Plaintiff, | **)** | |
| | **)** | |
| vs. | **)** | **ORDER** |
| | **)** | |
| **PAYMENTUS HOLDINGS, INC.,** | **)** | |
| | **)** | |
| Defendant. | **)** | |

**THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment. (Doc. No. 22). Plaintiff has filed a brief in opposition to the motion, Defendant has filed a reply brief, and this Court held a hearing on the motion. (Doc. No. 24, 27).

Having considered Defendant's motion and reviewed the pleadings, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Summary Judgment.

## I. BACKGROUND

Plaintiff is a female attorney who worked in Defendant's legal division from January 2020 until Defendant terminated her employment in May 2023. (Doc. No. 1 at 3). Defendant fired Plaintiff when she was 67 years of age. (Id.).

Defendant is a FINTECH company that facilitates electronic billing transactions. Plaintiff applied for an entry-level position with Defendant in 2020. (Doc. No. 23-5 at 33). Plaintiff's salary started at $123,000 per year, plus a $15,000 bonus. (Id. at 52). However, given Plaintiff's considerable experience—Plaintiff "was general counsel at Fortune 500 companies," (id. at 44)—Plaintiff stepped into a more complex role than Defendant originally envisioned for the

-1-

opening, (id. at 33). And although Defendant marketed the position's title as "Legal Counsel,"

Defendant changed the title to "Senior Legal Counsel" at Plaintiff's request. (Id. at 50).

Defendant recognized that Plaintiff was, and still is, over-qualified for the role. (Id. at 18).

Defendant claims that Plaintiff was fired for engaging in "unprofessional" behavior in the workplace. (Doc. No. 23-5 at 21). As an example, at the beginning of her employment, Plaintiff reported to John Knox Tyson, Vice President of Legal and Compliance. (Doc. No. 23-4 at 59). Tyson recalled one instance where Plaintiff asked Kate Johnson, the Office Manager, to make copies for her, and that request erupted into a conflict. (Doc. No. 23-5 at 21). Tyson also recounted that Plaintiff called Johnson a "fat ass" behind her back. (Id. at 24). Additionally, Tyson stated that Plaintiff made unprofessional comments about internal IT professionals. (Id. at 25). Those comments, reflected in a Slack exchange, show Tyson took offense at Plaintiff's comment that she was "so over [Gio]," a tech support professional, because IT was not able to fix her computer for 17 days. (Doc. No. 23-3 at 78).

Defendant also alleges that Plaintiff referred to Jerry Portocalis, Defendant's Chief Commercial Officer, as "Napoleon" because Portocalis was short. (Id. at 11–13). Plaintiff disputed Defendant's contention, and averred that she said Portocalis had a "Napoleon complex" because he was controlling. (Id.). Additionally, Brianna Barney, one of Defendant's human resources representatives, told Sarah Durbano, Defendant's Vice President of Human Resources, that Plaintiff could be "difficult," "impatient," and "abrasive." (Doc. No. 23-7 at 5). Johnson also communicated the same message to Durbano. (Id.).

Many of Defendant's complaints regarding Plaintiff surround Plaintiff's relationship with Jenny Wilkinson, whom Defendant hired to work alongside Plaintiff in the legal department on

-2-

October 1, 2021. (Doc. No. 26-4 at 29). Plaintiff and Wilkinson knew each other before Wilkinson started working for Defendant; in fact, Plaintiff even recommended that Defendant hire Wilkinson. (Id.; Doc. No. 23-3 at 84). While Wilkinson was negotiating with Defendant, Plaintiff sent Wilkinson an email recommending that Wilkinson ask Defendant for a salary of $150,000, a bonus, and stock options. (Id. at 71). Defendant hired Wilkinson at that salary. (Doc. No. 26-4 at 12–20, 93).

Plaintiff was responsible for training Wilkinson at the beginning of her tenure. (Doc. No. 26-1 at 4). The two co-existed amicably for months until tensions arose. In the summer of 2022, Plaintiff and Wilkinson butted heads over the "Change Notice Project" spearheaded by Plaintiff. (Doc. No. 24-4 at 32–33). Wilkinson stated that Plaintiff quit the project, leaving the large project solely on Wilkinson. (Id.). Plaintiff, however, contended that Wilkinson froze her out of the project. (Id. at 75). Plaintiff also claimed that she took other work from Wilkinson's plate to balance out the workload and ensure that Wilkinson was not overwhelmed by the project. (Id.).

That same summer, Defendant sought to expand the legal department by hiring a junior level attorney who would report to Plaintiff and Wilkinson. (Doc. No. 23-3 at 96–107). However, Plaintiff convinced Defendant to hire a more senior attorney and recommended, *inter alia*, Aonghus Martin, who had worked for Defendant as a contract attorney in New York City. (Id.). Plaintiff told Andrew Gerber, Defendant's new General Counsel, that Defendant would need to offer Martin at least $200,000 and sold Gerber on hiring Martin based on Martin's experience and expertise. (Id.). Gerber asked Plaintiff to help recruit Martin. (Id.). Thereafter, Plaintiff coordinated with Martin and tried to sell him on the job. (Id.). Plaintiff told Martin about the conversation she had with Gerber and told Martin not to tell anybody that she divulged

-3-

that information to him. (Id.). Plaintiff similarly told Wilkinson that she prepped Martin for the interview and not to tell anybody else. (Id.). Defendant hired Martin at a salary of $200,000 per year. (Id.).

At this time, Plaintiff made $165,000 per year. Gerber remarked to Plaintiff that he was "surprised" that Martin signed on at the same salary as Plaintiff. (Doc. No. 23-4 at 38–39). After learning about Martin's salary, and Gerber's apparent belief that Plaintiff made more than she did, Plaintiff requested a raise that equaled Martin's salary. (Id.).

On September 8, 2022, Nicole Haskins, a sales executive, complained to Gerber about Plaintiff's treatment of her. (Doc. No. 23-4 at 114). Haskins complained that the "tone and tenor" of Plaintiff's communications to her were "not professional," and that Haskins was receiving "mixed instructions" from Plaintiff and Wilkinson. (Id.). Haskins told Gerber that she would not accept Plaintiff's treatment of her, her partners, and her clients any longer. (Id.). Gerber spoke with Plaintiff about Haskins' complaint on September 12. (Doc. No. 26-2 at 65). When Gerber informed Plaintiff of Haskins' complaint, Plaintiff said "Oh, that bitch." (Id.). Gerber told Plaintiff to speak with Haskins, apologize, and smooth things over. (Id.). Haskins messaged Gerber and indicated that she "fell on [the] sword" and spoke with Plaintiff. (Doc. No. 23-4 at 114). Haskins told Gerber that "it was not fun and [she] just want[s] it to go away." (Id.). According to Haskins, Plaintiff did not apologize and instead berated Haskins and told Haskins not to "go around [her] and call my boss to complain." (Doc. No. 23-4 at 72).

The following day, Gerber said, Plaintiff told him that Tyson "was not competent to manage her." (Doc. No. 26-2 at 59). Plaintiff contends that the focus of the conversation was different. Plaintiff recounted that she talked to Gerber about her potential raise. (Doc. No. 26-1 at

-4-

7–8). Plaintiff acknowledged that she spoke to Gerber about the legal team's reporting structure, but noted her concern was that Martin appeared to be her superior. (Id. at 8). Plaintiff told Gerber that "[she] deserved equal pay for equal work, and that the pay disparity and altered reporting structure appeared to be intentional discrimination based on [her] age and gender." (Id.). Plaintiff averred that Gerber then "became irate, denied [her] requests, and ended the discussion." (Id.).

Gerber stated that he began drafting the Final Written Warning after this conversation and sent it to Plaintiff on September 22. (Doc. No. 26-2 at 59). The warning stated that "this will serve as a final written warning documenting that some of your recent behaviors are unacceptable, harmful to the legal team and to Paymentus, and inconsistent with the collaborative and supportive culture we desire to foster and maintain." (Doc. No. 23-4 at 72). The warning noted that Tyson gave Plaintiff verbal warnings in the past regarding Plaintiff's comments towards Johnson, and that Gerber was "also aware of similar inappropriate comments regarding Jerry Portocalis . . . and Nicole Haskins." (Id.). The warning then stated that "a few recent incidents have caused me serious concern with your ability to work in our culture." (Id.). These incidents included Plaintiff purportedly quitting the Change Notice Project, coordinating with Martin about his pay package, making disparaging comments about Tyson, and referring to Haskins as "that bitch" and then chastising her on what was supposed to be an apology call. (Id.).

The warning then demanded that Plaintiff "immediately refrain from the use of foul language and name calling in the workplace," as well as "speaking negatively to and about coworkers and clients." (Id. at 73). The warning informed Plaintiff that Plaintiff could face additional disciplinary action, including termination, if her behavior continued. (Id.).

-5-

Plaintiff responded that same day in a written letter to Gerber, Tyson, and Durbano, detailing why she believed Gerber's allegations were "untrue and inflammatory." (Id. at 74). First, Plaintiff contended that Johnson had been rude to her and that Tyson told Plaintiff that Johnson "seemed to have a problem with women." (Id.) (emphasis removed). Although Plaintiff did not deny making disparaging comments about Johnson, she did deny receiving a verbal warning for the incident. (Id.). Second, Plaintiff denied Gerber's assertion that she quit the Change Notice Project. (Id.). She claimed that she and Wilkinson had a misunderstanding about their roles in the project. (Id.). Plaintiff thought that Wilkinson froze her out of the project by telling a group of outside attorneys to report to Wilkinson and by coordinating with Gerber about the project. (Id.). In contrast, Wilkinson believed that Plaintiff dumped the entire project on her. (Id.). Plaintiff averred that she believed Wilkinson wanted to take the lead on the project and that she picked up other work to lighten Wilkinson's workload while she piloted the Notice Change Project. (Id.).

Third, Plaintiff denied "coaching" Martin about his compensation package. (Id. at 76). Plaintiff stated that Martin told her he would need at least a $200,000 salary, and Plaintiff responded by telling him that she made a below market salary. (Id.). Plaintiff claimed to have no knowledge of Martin's salary until Gerber disclosed it to her. (Id.).

Fourth, Plaintiff claimed that she requested a new reporting structure because Tyson, who worked in compliance, was not a transaction attorney and that it did not make sense that her and Wilkinson, who are both transaction attorneys, reported to him. (Id. at 77). Plaintiff also recalled that Gerber "mentioned on the way to lunch that someone at the company . . . referred to the transaction group . . . as 'the ladies in legal.'" (Id.). Plaintiff claimed that the remark was sexist

and "underscored [Plaintiff's] concern that [Plaintiff and Wilkinson] were considered to be in a different category than the other attorneys in the company due to [their] reporting structure." (Id.).

Fifth, Plaintiff explained that she had "friction" with Haskins because Haskins purportedly "close[d] deals in an unorthodox manner." (Id.). Plaintiff contended that the incident between her and Haskins the week before was caused by another misunderstanding: Haskins thought that Plaintiff chided her for delaying a project, but Plaintiff posited that her comment was actually directed at a vendor that failed to respond to their communications for an extended period of time. (Id. at 78). Plaintiff denied berating Haskins over the phone and stated that she simply asked Haskins to talk to Plaintiff about their issues before elevating the matter to Plaintiff's supervisor. (Id.). Plaintiff said that she "[stood] by the way [she] handled [her] call to [Haskins]," but that she apologized for calling Haskins a "bitch" in her conversation with Gerber. (Id.). Plaintiff added that she "take[s] full responsibility for that and [that] it will not happen again." (Id.).

Plaintiff then explained why she "originally accepted sub-par pay" to join Defendant. (Id.). She contended that she accepted the job because she struggled to find employment because of her age, and that she expected her compensation to rise as she showed her value to the company. (Id.). She stated that the work she performed was never meant for a junior attorney. (Id.). She posited that her "salary . . . remained low simply due to [her] age, and the fact that management is aware that [she had] few opportunities outside of Paymentus due to the fact that [she was] closing in on retirement age." (Id. at 79). She asserted "[t]hat is the essence of [a]ge [d]iscrimination." (Id.). Finally, Plaintiff contended that she was being frozen out of her job

-7-

because Gerber had divided her work between Martin and Wilkinson within the past two weeks. (Id.).

Plaintiff spoke with Durbano about the warning a few weeks later. Durbano claimed that Plaintiff used the meeting to disparage Wilkinson and deny Gerber's allegations. (Doc. No. 26-5 at 14–20). Plaintiff contended that she spoke with Durbano about her discrimination allegations and reported that Tyson had been yelling at her. (Doc. No. 26-1 at 9–10).

Plaintiff received no new complaints for the next few months. On December 20, 2022, Gerber recommended that Plaintiff receive a raise to match Martin's compensation. (Doc. No. 23-4 at 83). Gerber stated that "[Plaintiff] does a **ton** of work, is a great lawyer, and has been much improved since our behavioral chat." (Id.) (emphasis in original). Plaintiff's raise—up to $190,000 plus bonuses—ultimately fell slightly short of Martin's compensation, even though they did the same work. (Doc. No. 26-1 at 11).

According to Plaintiff, Tyson gave her a glowing performance review in January 2023 that stated that she exceeded expectations. (Id.). Plaintiff also claimed that, during the review meeting, Tyson "admitted that he knew most of the allegations in the [Final Written Warning] were untrue" and told Plaintiff to "[j]ust consider all of this behind you." (Id.). Thereafter, Plaintiff began reporting directly to Gerber. (Id.).

However, around this time, Gerber claimed that Plaintiff and Wilkinson were again at odds and that Plaintiff was primarily responsible. (Doc. No. 26-2 at 124). On January 30, Wilkinson emailed Gerber and told him that Plaintiff was acting like her supervisor and accused Wilkinson of not being "a team player anymore." (Doc. No. 23-2 at 8). Gerber responded and

made clear to Wilkinson that Plaintiff was not her supervisor and told her to "[p]lease hang in there." (Id.).

On February 17, 2023, Gerber and Durbano ordered Plaintiff and Wilkinson to complete counseling. (Doc. No. 23-3 at 114). They stated that "[p]articipation in this workplace counseling/facilitation is not optional." (Id.) (emphasis omitted). On March 3, Kamella Emmanuel, the counselor, informed Gerber that "[Plaintiff and Wilkinson] have been progressing positively once [Emmanuel] communicated and clarified the reporting structure." (Doc. No. 23-4 at 93). Emmanuel recommended that the legal department restart team meetings to ensure everyone remained on the same page, but Gerber rejected the recommendation. (Id. at 92). Gerber "[did] not believe a lack of team meetings results in their behavior towards each other," and stated that "[he] will consider restarting team meetings after [Plaintiff and Wilkinson] resolve their issues." (Id.). Gerber also told Emmanuel that he did not believe that Plaintiff was taking counseling seriously. (Id. at 90). He insisted "that she (1) is only doing this because it is required, (2) does not believe in the process[,] and (3) finds the only noted benefit is that she was able to tell [Wilkinson] what was on her mind." (Id.). Gerber added that he did not believe that Plaintiff was "open to any other views." (Id. at 94).

Then, Emmanuel changed her tune and claimed that Gerber's assessment "doesn't surprise her at all and therein lies the problem!" (Id.). She expounded that she "believe[d] [Wilkinson was] benefiting from the coaching," but that Plaintiff "[was] not used to the feedback." (Id.). A few weeks later on March 27, Emmanuel sent Gerber her final report. (Id. at 87). Emmanuel stated that emotions ran high between the two, and that Plaintiff was hurt by what she perceived as a breakdown in their friendship. (Id. at 87–88). She noted that Plaintiff

-9-

was not open to feedback and "exhibited some passive aggressive behavior towards the objectives during the sessions." (Id. at 88). She did not believe that Plaintiff "show[ed] evidence of self-reflection or emotional intelligence." (Id.). However, Emmanuel determined that the reporting structure "was a huge part of their conflict," and that they "created solutions to the work distribution which made work flow easier, clarifying their role[s] and preferred communication style." (Id.). Additionally, Emmanuel recounted that Plaintiff and Wilkinson admitted that the counseling "was of value[,] . . . created less friction[,] and [was] working for them both." (Id.).

Emmanuel instructed Plaintiff to work on "treat[ing] others with respect," listening to others, taking responsibility for her behavior, and her willingness to compromise. (Id.). Emmanuel recommended that Gerber provide Plaintiff and Wilkinson regular feedback and conduct "[r]egular [t]eam meetings to provide updates." (Id. at 89).

Soon thereafter on April 5, Gerber chastised Plaintiff for using "inappropriate and unnecessary" language in an email to a coworker. (Id. at 113). In that email, Plaintiff told a coworker that the company did not use a certain form "for US clients," as "that form is to be used only in Canada—despite the fact that your predecessors screwed this up." (Id.). Plaintiff then told the coworker that she would send him a new draft, and apologized for the fact that it would take a few days for her to do so. (Id.).

Gerber also learned around this time that Plaintiff texted Wilkinson about a job opening nearby and encouraged Wilkinson to apply for it. (Doc. No. 23-3 at 112). Plaintiff learned of the job through a recruiter and stated that she did not want to apply for it because the salary was lower than hers and too far away for her preferences. (Id.). After Wilkinson stated that she was

not interested, Plaintiff then texted her, "Ok then, can we please stop the stress? I just want peace. You can have total control. I honestly was trying to make the department run smoothly. At this point [I] am so stressed my goal is to do my work." (Id.). Wilkinson replied that "my goal is to do my work also." (Id.).

In an email to others in the company, Gerber stated that he was considering firing Plaintiff because her behavior had not improved. (Doc. No. 23-4 at 101). Gerber said that he had been "coordinat[ing] with HR and outside counsel since September" and developed a severance package for Plaintiff that included a clause prohibiting Plaintiff from suing Defendant. (Id.) Gerber told others in the company that he "believe[d] she will likely make a claim and would like to cut that off." (Id.).

Finally, on May 5, Defendant terminated Plaintiff's employment and offered her a severance package. (Id. at 110). The termination letter largely recounted Defendant's version of the events above, noting repeatedly that Plaintiff's behavior was detrimental to the company. (Id. at 110–12). The letter cited incidents that occurred since Defendant gave Plaintiff her written warning, including Plaintiff's purported use of inappropriate language, her unwillingness to take counseling seriously, and her message to Wilkinson about a potential job opening. (Id.). Plaintiff refused the severance package. Thereafter, Defendant replaced Plaintiff with Sarah Hinton, who was in her 40s. (Doc. No. 26-2 at 167).

Plaintiff then filed this action against Defendant asserting (1) gender discrimination in violation of Title VII of the Civil Rights Act of 1964; (2) retaliation in violation of Title VII; (3) age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"); (4) retaliation in violation of the ADEA; (5) a violation of the Equal Pay Act of 1963

-11-

("EPA"); and (6) wrongful discharge in violation of North Carolina's public policy pursuant to N.C. GEN. STAT. § 143-422.2. (Doc. No. 1 at 12–21). Defendant moved for summary judgment on each of Plaintiff's claims. (Doc. No. 22). Plaintiff filed a response, Defendant filed a reply, and this Court held a hearing on the summary judgment motion on September 30, 2025.  (Doc. Nos. 24, 27).

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id.

In reviewing a motion for summary judgment, the Court "must review the record taken as a whole." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000) (citation modified). "However, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Id. (citation modified).

The burden rests on the moving party to show both that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant makes such a showing, the non-moving party must point to "specific, material facts" in the record that give rise to "genuine issues." Sedar v. Reston Town Ctr. Prop., LLC, 988 F.3d 756, 761 n.3 (4th Cir. 2021); see id. "The evidence must be

-12-

such that the jury reasonably could find for the nonmoving party." <u>Phillips v. CSX Transp., Inc.</u>, 190 F.3d 285, 287 (4th Cir. 1999).

## III.   DISCUSSION

Defendant argues that the Court should grant summary judgment for Defendant on each of Plaintiff's claims. For the reasons set forth below, the Court agrees that Defendant is entitled to summary judgment on Plaintiff's Title VII discrimination claim and EPA claim, but not on Plaintiff's Title VII retaliation claim, ADEA claims, and North Carolina wrongful termination claim.

### a.   Retaliation

Title VII's anti-retaliation provision makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this title." 42 U.S.C. § 2000e-3(a). The ADEA contains a nearly identical provision: it prohibits an employer from retaliating against an employee "because such individual, member or applicant for membership has opposed any practice made unlawful" by the ADEA. 29 U.S.C. § 623(d).

For the purposes of Plaintiff's claims, both Title VII and the ADEA operate under the <u>McDonnell Douglas</u> burden-shifting framework established by the Supreme Court. <u>Westmoreland v. TWC Admin. LLC</u>, 924 F.3d 718, 725 (4th Cir. 2019); <u>Dowe v. Total Action Against Poverty</u>, 145 F.3d 653, 656 (4th Cir. 1998). Under that framework, Plaintiff must first establish a prima facie case of discrimination. <u>Sempowich v. Tactile Sys. Tech., Inc.</u>, 19 F.4th 643, 649–50 (4th Cir. 2021). "The burden at this stage is not onerous, and meeting it in effect creates a presumption that the employer unlawfully discriminated against the employee."

-13-

Westmoreland, 924 F.3d at 725 (citation modified). If the plaintiff makes such a showing, the burden shifts to the defendant "to put forth a nondiscriminatory explanation for its actions." Sempowich, 19 F.4th at 650. "This burden is one of production, not persuasion; it can involve no credibility assessment." Westmoreland, 924 F.3d at 725. Finally, if the defendant carries its burden, "the McDonnell Douglas framework—with its presumptions and burdens—disappears" and the plaintiff "must prove by a preponderance of the evidence that the legitimate reasons offered by the [defendant] were not its true reasons, but were a pretext for discrimination." Id. at 726 (citation modified); see Sempowich, 19 F.4th at 650.

To state prima facie claims of retaliation under both Title VII and the ADEA, the plaintiff must show that "(1) [s]he engaged in protected activity; (2) [her] employer took adverse action against [her]; and (3) a causal nexus existed between the protected activity and the adverse action." Massaro v. Fairfax Cnty., 95 F.4th 895, 902 (4th Cir. 2024).

An adverse employment action is an action that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011). The action must be sufficiently punitive such that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (citation modified).

To prove "a causal nexus," the plaintiff "must show that [the defendant]" took the adverse action against her "because [she] engaged in a protected activity." Massaro, 95 F.4th at 902 (citation modified). Such causation may be "inferred when the employer takes [the] adverse employment action against [the] employee shortly after learning of the protected activity." Id.

-14-

(citation modified). Conversely, a temporal lag, even as short as a couple months, supports the inference that no causal connection exists between the protected activity and the adverse employment action. Id.; Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 127 (4th Cir. 2021). Nevertheless, "establishing a causal relationship at the prima facie stage is not an onerous burden." Roberts, 998 F.3d at 127.[1]

Here, Plaintiff has stated a prima facie claim of retaliation under Title VII and the ADEA. First, she showed that she engaged in protected activity by complaining to Gerber about sex and age discrimination on September 13, 2022, and multiple times thereafter. Second, Plaintiff showed that Defendant took an adverse employment action against her by terminating her employment. Third, viewing the evidence in the light most favorable to Plaintiff and granting her all reasonable inferences deducible therefrom, Plaintiff showed that her termination was causally connected to her complaint of sex and age discrimination.

Although, the roughly eight-month period between Plaintiff's complaint and her termination supports the inference that she was not the victim of retaliation, see id., time is but one factor the Court considers when analyzing a plaintiff's retaliation claim. In this case, various other facts support the reasonable inference that Defendant's stated rationale is pretextual.

First, Gerber purportedly became angry when Plaintiff accused Defendant of discrimination, and shortly after that sent Plaintiff a written warning that relied heavily on older

---

[1] Critically, the plaintiff's underlying complaint need not be meritorious—it is enough to show that her employer retaliated against her because of the complaint itself.

-15-

conduct—conduct that up to that point had not elicited a formal response from the company and that Tyson said mostly did not occur.[2]

Second, Gerber's statement to Wilkinson in January telling her to "hang in there" insinuates that Defendant intended to terminate Plaintiff's employment well before she received her termination letter in May.

Third, Plaintiff's behavior after she received the Final Written Warning was largely innocuous. It is uncontested that her behavior from September to January was exemplary. However, tensions bubbled up again when Plaintiff questioned whether Wilkinson was "a team player," and Gerber ordered Plaintiff and Wilkinson to attend counseling. Emmanuel reported that both were progressing well until Gerber told her that he thought Plaintiff was not taking counseling seriously; thereafter, Emmanuel immediately changed her tune and criticized Plaintiff's attitude. It can reasonably be inferred that Gerber poisoned the well and influenced Emmanuel's report, especially considering that Defendant chose the counselor and paid for her services. Further, Plaintiff's statement to a coworker that a previous employee "screwed up" a form is hardly contemptuous. Taken together, it is reasonable to infer that Defendant was fishing for reasons to terminate Plaintiff lawfully and used these largely benign occurrences as a pretext to fire her.[3]

---

[2] Of course, the warning itself is not an adverse action because it did not change Plaintiff's employment conditions. See Hoyle, 650 F.3d at 337; Bush v. MAG DS Corp., No. 1:18-cv-615, 2020 WL 201044, at *3 (E.D. Va. Jan. 13, 2020) (stating that a written warning is not an adverse employment action). Nevertheless, the warning may properly be considered when determining whether Plaintiff's termination was causally related to her complaint.

[3] Plaintiff also texted Wilkinson during this time and notified her about a job opportunity closer to Wilkinson's home and with higher pay. When Wilkinson stated that she wasn't interested, Plaintiff communicated that she wanted the two of them to work out their issues. Viewed in the light most favorable to Plaintiff, the text exchange was not inappropriate.

-16-

Finally, Gerber acknowledged that he believed Plaintiff would bring a lawsuit upon her termination and that he had been working towards that end with human resources and outside counsel since September—the month Plaintiff made her complaint.

Accordingly, it is reasonable to infer that Gerber decided in September to terminate Plaintiff after she complained about sex and age discrimination, then hired outside counsel to make Plaintiff's termination look above board. Therefore, Plaintiff has carried her less-than-onerous burden of showing a causal connection between her complaint and her termination. See Roberts, 998 F.3d at 127.

Of course, the burden then shifts to Defendant to show that it terminated Plaintiff for a non-retaliatory reason. Dowe, 145 F.3d at 656. And Defendant did just that: it produced evidence showing that it fired Plaintiff for inappropriate workplace behavior.

Thus, the burden shifts back to Plaintiff to show that Defendant's non-retaliatory rationale is pretextual. Id. Plaintiff has made such a showing. The same facts that support a causal connection between Plaintiff's complaint and her termination support the inference that the rationale Defendant proffered for her termination is pretextual: viewed in the light most favorable to Plaintiff, the evidence reasonably supports Plaintiff's theory that Defendant decided to terminate her in September and worked over a period of months to make it appear non-retaliatory.

Accordingly, Plaintiff has shown that there is genuine issue of material fact surrounding her retaliation claims.

**b. Discrimination**

Title VII, in part, makes it unlawful for an "for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1) (citation modified). Similarly, the ADEA provides that "[i]t shall be unlawful for an employer (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a).

In this case, both claims are analyzed using the same <u>McDonnell Douglas</u> burden shifting framework set forth above: once the plaintiff states a prima facie claim, the burden shifts to the defendant to show a non-retaliatory reason for taking its adverse action against the plaintiff, and then the burden shifts back to the plaintiff to show that the defendant's stated reason is pretextual. <u>Westmoreland</u>, 924 F.3d at 725; <u>Sempowich</u>, 19 F.4th at 649–50.

### i. Title VII Discrimination

To state a prima facie claim for discrimination under Title VII, Plaintiff

must show that (1) she is a member of a protected class; (2) her employer took an adverse action against her; (3) she had been fulfilling her employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination, including because the employer left open the position or replaced the plaintiff with someone outside the protected class.

<u>Sempowich</u>, 19 F.4th at 649–50. Here, Plaintiff failed to state a prima facie claim of sex discrimination under Title VII because she has not shown that her termination "occurred under circumstances that raise a reasonable inference of unlawful discrimination." <u>Id.</u> at 650. In fact, Defendant hired another woman to replace Plaintiff after she was fired. It strains credulity to maintain that Defendant discriminated against Plaintiff because of her sex when Defendant

-18-

replaced her with another person of the same sex. Plaintiff's arguments to the contrary are unavailing.

First, Plaintiff points to the fact that someone in the company referred to Plaintiff and Wilkinson as the "ladies in legal." (Doc. No. 26-2 at 88). Although the phrase implicates Plaintiff's and Wilkinson's gender, it is not derisive. And even if it were, Plaintiff has not explained how her coworker's use of the phrase relates to her firing.

Second, Plaintiff alleges that Defendant discriminated against her based-on sex because men held more senior positions than Plaintiff despite her extensive experience. She posits that she and Wilkinson were kept at the bottom of the legal division while men, such as Martin and Gerber, were hired into senior positions. However, Plaintiff has not shown that Defendant's corporate structure and hiring practices were discriminatory. Defendant's organizational chart shows an ever-evolving reporting structure with men and women scattered throughout the chain of command. See (Doc. No. 23-4 at 58–71). It is also irrelevant that, upon his hiring, Martin reported directly to Gerber because Plaintiff advocated for Defendant to hire Martin and for him to report directly to Gerber. And eventually, at Plaintiff's behest, Plaintiff, Martin, and Wilkinson each reported directly to Gerber. Thus, Defendant's organizational structure was not discriminatory.

Even when viewing the evidence in the light most favorable to Plaintiff and granting her all reasonable inferences fairly deducible therefrom, Plaintiff has failed to state a prima facie claim for gender discrimination under Title VII.

### ii. ADEA Discrimination

To state a prima facie claim for age discrimination under the ADEA, Plaintiff "must prove that (1) at the time of her firing, she was at least 40 years of age; (2) she was qualified for the job and performing in accordance with her employer's legitimate expectations; (3) her employer nonetheless discharged her; and (4) a substantially younger individual with comparable qualifications replaced her." Westmoreland, 924 F.3d at 725. Here, Plaintiff has carried her burden because (1) she was in her 60s when Defendant fired her (2) she received excellent performance reviews and was, by all accounts, performing well in her role; (3) Defendant terminated her employment; and (4) she was replaced by an employee in her 40s.

Next, the burden shifts to Defendant to "rebut this presumption of discrimination" by "produc[ing] evidence that it acted for a legitimate, nondiscriminatory reason." Id. (citation modified) (citing Reeves, 530 U.S. at 142). As it did with Plaintiff's Title VII claim, Defendant carried its burden here by showing that it terminated Plaintiff for inappropriate workplace behavior.

Finally, Plaintiff must show that Defendant's stated rationale is pretextual. Id. at 726. Furthermore, Plaintiff must show that age was a but-for cause of her termination. Gross v. FBL Fin. Servs., 557 U.S. 167, 175–76 (2009). Plaintiff has sufficiently shown that Defendant's stated rationale is pretextual for the same reasons stated above. Viewed in Plaintiff's favor, the evidence establishes that Defendant decided to fire Plaintiff in September and worked for months to make her termination appear lawful.

Accordingly, Plaintiff has shown that there is a genuine issue of material fact regarding whether Defendant discriminated against her because of her age.[4]

_____

[4] Plaintiff may proceed on her claims of age and sex discrimination concurrently, even though

### c. Equal Pay Act

The EPA prohibits employers from

> discriminating between employees on the basis of sex by paying wages to employees at a rate less than the rate at which the employer pays wages to employees of the opposite sex for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

Spencer v. Va. State Univ., 919 F.3d 199, 203 (4th Cir. 2019) (citation modified). To state a prima facie case of discrimination thereunder, Plaintiff must show that "(1) the [employer] paid higher wages to an employee of the opposite sex who (2) performed equal work on jobs requiring equal skill, effort, and responsibility (3) under similar working conditions." Id. "This initial showing permits an inference that a pay disparity was based on sex discrimination" and "stands even without the support of any evidence of discriminatory intent." Id. Once Plaintiff makes such a showing, the burden shifts to Defendant "to show that the pay differential was based on a factor other than sex." Id.

Assuming that Plaintiff stated a prima facie case of pay discrimination, Plaintiff's claim fails because Defendant produced a non-discriminatory rationale for the difference between Plaintiff's and Martin's pay: Martin was an experienced contract attorney who lived in New York City, which has a higher cost of living, and would therefore demand a higher salary to be lured to the company. The Court need not take Defendant's word for it; Plaintiff made this same

---

her age discrimination claim must be a "but-for" cause of her termination. The Court need not decide at this stage whether Plaintiff may recover under both Title VII and the ADEA. See Williams v. Fla. Atl. Univ., No. 15-60621-CIV-GAYLES/TURNOFF, 2016 WL 1089423, at *5 (S.D. Fla. Mar. 21, 2016).

argument to Defendant when she advocated for Defendant to hire Martin. She even went so far as recommending that he be paid $200,000—the salary Plaintiff now claims is discriminatory. Additionally, Plaintiff has provided no evidence that Defendant's proffered rationale is pretextual. Therefore, the Court grants summary judgment to Defendant on Plaintiff's EPA claim.

### d. North Carolina Wrongful Discharge

N.C. GEN. STAT. § 143-422.2 provides that "[i]t is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap." Although this statute does not itself create a private right of action, it may serve as the foundation to a claim for wrongful discharge in violation of public policy. Jackson v. Blue Dolphin Commc'ns of N.C., L.L.C., 226 F. Supp. 2d 785, 792 (W.D.N.C. 2002).

Given that N.C. GEN. STAT. § 143-422.2 does not itself contain standards of conduct, the North Carolina Supreme Court has stated that courts "look to federal decisions for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases." North Carolina Dep't of Correction v. Gibson, 308 N.C. 131, 136 (1983). For claims involving sex discrimination, "the North Carolina Supreme Court has explicitly adopted the Title VII evidentiary standards in evaluating a state claim under [Section] 143-422.2 insofar as they do not conflict with North Carolina statutes and case law." Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995); see Johnson v. Crossroads Ford, Inc., 230 N.C. App. 103, 111 (2013). And for claims involving age discrimination, the Court applies the same standard that it applies to Plaintiff's ADEA claim. See Magaha v. W & B Trucking, Inc., No. 1:15-cv-159-MOC-DLH, 2015 WL

8759260, at *4 (W.D.N.C. Dec. 14, 2015); Rishel v. Nationwide Mut. Ins. Co., 297 F. Supp. 2d 854, 875 (M.D.N.C. 2003); Gibson, 308 N.C. at 136.

Because Plaintiff's state law claim is coterminous with her Title VII and ADEA claims, Plaintiff's age discrimination claim may proceed but her sex discrimination claim will be dismissed.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's motion as to claims One and Five, but **DENIES** Defendant's motion as to Plaintiff's other claims.

### ORDER

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 22) is **GRANTED** as to claims One and Five, but **DENIED** as to Claims Two, Three, Four, and Six. This matter shall proceed to trial on Plaintiff's Claims Two, Three, Four, and Six.

Signed: November 3, 2025

Max O. Cogburn Jr.
United States District Judge

-23-